IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JOY COLLINS, in her capacity as guardian *ad litem* for Paul Collins,

        Plaintiff,

    v.

WAL-MART STORES, INC., d.b.a. WAL-MART,

        Defendant.

CV-07-1780-ST

FINDINGS AND RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

    Plaintiff, Paul Collins ("Collins"), filed this lawsuit on November 30, 2007, alleging claims against his former employer, defendant Wal-Mart Stores, Inc., dba Wal-Mart ("Wal-Mart"), arising out of various actions taken against him during the last year and a half of his five-plus years of employment with Wal-Mart.[1]  The Complaint alleges two claims, one for violation

---

[1] Collins was originally the sole named plaintiff in his individual capacity.  Complaint (docket #1).  On April 22, 2008, this court granted Plaintiff's Petition for Appointment of Guardian *Ad Litem* (docket #16), appointed Collins' wife, Joy Collins ("Mrs. Collins") as Collins' guardian *ad litem*, and ordered the case caption amended (docket #26).

of the Americans with Disabilities Act ("ADA"), 42 USC §§ 12101-17 ("First Claim"), and one

for violation of the Oregon statutes prohibiting discrimination against persons with disabilities,

ORS 659A.100-.145 ("Second Claim").  Collins seeks monetary and equitable remedies

including economic damages (back and front pay), non-economic damages, punitive damages,

reinstatement, attorneys fees, costs and disbursements.

This court has jurisdiction over the ADA claim pursuant to 28 USC § 1331 and 42 USC

§ 12117(a), and supplemental jurisdiction over the related state law claim pursuant to 28 USC

§ 1367(a).  Wal-Mart has filed a motion for summary judgment against both claims (docket #34).

For the reasons that follow, Wal-Mart's motion should be GRANTED IN PART and DENIED

IN PART.

## SUMMARY JUDGMENT STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

2 - FINDINGS AND RECOMMENDATION

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). In employment discrimination cases "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry - one that is appropriately conducted by the fact finder upon a full record." *Schnidrig v. Columbia Mach.*, 80 F3d 1406, 1410 (9th Cir) (internal quotations, citation omitted), *cert denied*, 519 US 927 (1996).

## UNDISPUTED FACTS

### I. Wal-Mart Wood Village Store Management Structure

Beginning in 2001, Collins worked at Wal-Mart's store in Wood Village, Oregon. Def. Exs. 5-6.[2] Some time in 2005, the Wood Village store was expanded into a "SuperCenter" and became a 24-hour store. Def. Ex. 4, Deposition of Rick Skarpac ("Skarpac Depo."), p. 20. To provide adequate management coverage at stores open 24-hours a day, Wal-Mart rotates managers' schedules and hours. *Id* at 21. This rotation not only ensures cross-training and adequate coverage, but also provides managers with needed breaks from working long hours and weekends. Skarpac Decl., ¶ 5; Schey Decl., ¶ 3.

---

[2] Unless otherwise noted, "Def. Ex." refers to exhibits attached to the Declaration of Sharon Bolesky in Support of Motion for Summary Judgment (docket #39) and Supplemental Declaration of Sharon Bolesky in Support of Motion for Summary Judgment (docket #56).

The Wood Village store is managed by a store manager.  Two people held the position of store manager during plaintiff's employment:  John Pickle and Greg Welte ("Welte").  Skarpac Depo., p. 26.  Wal-Mart Super Centers also commonly have two co-managers, one for "grocery" and one for "hardlines."  *Id* at 7-9; Def. Ex. 30.  Below the co-managers are assistant managers who supervise several departments within a store.  Skarpac Decl., ¶ 5.  Assistant managers also are required to rotate between the different departments for cross training purposes.  *Id*; Skarpac Depo., pp. 31-32.  The Wood Village store has between six and twelve assistant managers at any given time.  Skarpac Decl., ¶ 6; Skarpac Depo., pp. 7-8. Assistant managers, with the approval of the store manager, are primarily responsible for determining which position an associate will hold, and have the authority to reassign an associate to another position.  Skarpac Depo., pp. 36-37.  Below the assistant managers at the Wood Village store are about 25 to 30 department supervisors.  *Id* at 7; Skarpac Decl., ¶ 7.  Unlike assistant managers, department supervisors are hourly employees responsible for up to five interrelated departments.  Customer service managers are the supervisors responsible for associates in the front end.  *Id.*

At the time of Collins' termination in August 2006, Welte was the store manager.  Def. Ex. 33 ("Schey Depo."), p. 58.  Rick Skarpac ("Skarpac") was the "hardlines" co-manager[3] and Paul Crawford was the "grocery" co-manager.  Def. Ex. 30.  Suzanne Schey ("Schey") and Jim Patterson ("Patterson") were assistant managers under Skarpac.  *Id.*

///

///

## II.  **Wal-Mart Employment Policies**

[3] Skarpac states that he moved from "grocery" to "hardlines" in December 2006.  Skarpac Decl., ¶ 4.  That later date appears to be in error according to the documentation.

**A. <u>Anti-Discrimination Policies</u>**

Wal-Mart's Discrimination and Harassment Prevention Policy prohibits discrimination and harassment on the basis of "race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran's status, sexual orientation, or any other legally protected status." Def. Exs. 10, 29. The policy also provides associates with multiple avenues to report concerns. Def. Ex. 10. When he was hired, Collins received a copy of the Associate Handbook which contains Wal-Mart's policies and procedures, including the equal opportunity employment policies. Def. Exs. 8, 10.

**B. <u>Meal and Rest Break Policies</u>**

Wal-Mart follows BOLI's guidelines for its meal and rest break policies. Def. Ex. 27; Skarpac Depo., pp. 71-72. The policy provides that for shifts under seven hours, associates must take their meal break between their second and fourth hour and finish by their fifth hour; for shifts over seven hours, associates must take their meal break between their third and fifth hour and finish by the end of their sixth hour. Def. Ex. 27. Wal-Mart also provides associates with a 15 minute break in each four hour period. Def. Ex. 3 ("Crawford Depo."), p. 17. Associates are required to take their breaks in the break room or the smoking lounge. Skarpac Depo., p. 72. Collins admitted that he would sometimes take his breaks in the sprinkler room. Def. Ex. 1 ("Collins Depo."), p. 122.

Wal-Mart posts schedules listing each hourly associate's shift and meal time, so associates know when to take their breaks to comply with Wal-Mart policy, as well as state and federal law. Def. Ex. 26. Wal-Mart expects its employees to work while they are on the clock

and to take their breaks when scheduled.  Def. Ex. 10.  Collins understood this expectation.

Collins Depo., p. 56.

Collins' typical work day began at 7:00 a.m. and ended at 4:00 p.m., with lunch from

11:00 a.m. to 12:00 p.m.  *Id* at 30.  His scheduled breaks were at 10:00 a.m. and at 3:00 p.m.  *Id*

at 88-89.  He acknowledged that he would sometimes take breaks when he felt like it, whether or

not it was his scheduled time to take a break.  *Id* at 88.  At least once a week, he would visit with

his wife while she shopped at the store, and walked out to her car with her whether or not it was

his scheduled break.  Def. Ex. 2, Deposition of Joy Collins ("J. Collins Depo."), p. 128; Schey

Decl. ¶ 10; Prosser Decl. ¶ 8.

### C.  **Discipline Policy**

Wal-Mart follows a Coaching for Improvement discipline policy.  Although the policy is

designed to be progressive, more severe misconduct can result in a higher level of discipline, up

to and including termination for a first offense.  Def. Ex. 28; Skarpac Depo., pp. 79-81.  For less

severe misconduct and poor performance, the first level of discipline is "Verbal."  Def. Ex. 28.

The second level of discipline is "Written."  *Id*.  At the third level of discipline, "Decision-

Making Day," associates are notified they will be terminated for further violations of Wal-Mart

policy.  *Id*.  The fourth, and final, level of discipline is "Termination."  *Id*.  Management must

discharge an associate for misconduct or poor performance infractions that occur within one year

of a Decision-Making Day.  *Id*.

///

///

///

6 - FINDINGS AND RECOMMENDATION

### III.  Collins' Work History

Collins was born in 1946 and raised in Monterey, California.  Collins Decl., ¶ 3.  In 1969, a few years after completing high school, Collins began his first job working as a groundskeeper for the City of Monterey, California.  *Id* at ¶¶ 5, 7; Collins Depo., p. 11.  Collins held that position for about 20 years, eventually leaving the job in 1989 due to a medical disability.[4] Collins Decl., ¶ 7.  Between 1989 and 1991, Collins lived with his brother in Hawaii, then returned to Monterey, California, for about a year.  Collins Depo., pp. 14.

In 1992, Collins and his wife moved to Fresno, California, where they operated a cleaning business until 1999.  *Id* at 14-15.  His wife handled the money and customers, while he performed cleaning and moving and other tasks assigned by his wife.  Collins Decl., ¶ 8.

In 1999, Collins and his wife moved to Portland, Oregon, where he sought, but was unable to obtain, employment.  *Id* at ¶ 9.  In the fall of 2000, Mrs. Collins contacted Goodwill Industries of the Columbia Willamette ("Goodwill"), seeking assistance in finding Collins a job. J. Collins Decl., ¶ 4.  Her understanding was that Goodwill had a job-training and placement program for individuals with disabilities.  *Id*.

### IV.  Collins' Mental Impairment

Collins has what he describes as a "learning disability" and is "slow."  Collins Depo., p. 12.  He reads the Bible, does some gardening, swims, plays the bass guitar, and cleans.  *Id* at 18-19.  Although Collins held a driver's license in California, he did not apply for a driver's license when he moved to Oregon because he is a "little nervous" and has increasing vision problems.  *Id* at 59.

---

[4] The medical disability that caused Collins to leave his job with the City of Monterey was apparently precipitated by several deaths in his family after which he "just kind of fell to pieces" and "needed rest."  Collins Depo, p. 12.

Collins applied for Social Security disability insurance benefits based on his learning

disability and low vision, but that claim was denied in October 2007.  *Id* at 10; J. Collins Depo.,

pp. 121-22; Def. Ex. 34.

**V.  Collins' Employment History at Wal-Mart**

    **A.  Garden Department**

In February 2001, Collins applied for employment at Wal-Mart's Wood Village store.

Def. Ex. 5.  Christine McLaughlin ("McLaughlin"), Collins' Goodwill advisor, accompanied

Collins to his initial interview with Wal-Mart.  *Id*; Crawford Depo., pp. 12, 14.  At that time,

Kevin Crawford ("Crawford") was the personnel manager at the Wood Village store.  Either

McLaughlin, Mrs. Collins, or Collins told Crawford that Collins was reentering the job market

and needed some assistance.  Crawford Depo., p. 14.

On May 16, 2001, Wal-Mart hired Collins in the Wood Village store's Garden

Department as a sales associate/waterer.[5]  Collins Depo., pp. 17, 26-27; Crawford Depo., p. 12;

Def. Ex. 11.  Mrs. Collins asked Crawford if she could accompany Collins to orientation,

explaining that Collins had a disability and needed help.  J. Collins Decl., ¶ 5.  Crawford agreed

and at the orientation gave Mrs. Collins all the paperwork and forms to review.  *Id*.  Mrs. Collins

assisted Collins in filling out the paperwork in the orientation packet.  Crawford Depo., p. 14;

Collins Depo., pp. 52, 53; Collins Decl., ¶ 11; Def. Exs. 8, 9.  At the orientation, Collins signed a

document acknowledging receipt of Wal-Mart's Associate Handbook.  Def. Ex. 8.  Although he

---

[5] Mrs. Collins and Collins both believed that Collins was applying for a "People Greeter" position at the time of his initial interview.  Collins Decl., ¶¶ 10, 12; J. Collins Decl., ¶ 4.  However, he did not start as a People Greeter; instead, "the only thing that was handed to [Collins when he first started working at Wal-Mart] was a water hose and [told] to water the plants." Collins Depo., p. 27; Collins Decl., ¶ 13.  Collins' initial performance appraisal lists his position as "Waterer," and a later "Associate's Commendation Form" reflects a job change from a Garden Associate to People Greeter in mid-2004. Def. Exs. 11, 15.

could read the statements in the acknowledgment, Collins did not understand what they meant. Collins Depo., pp. 52-54.

Many of Wal-Mart's administrative functions are performed through computer-based learning ("CBL"). Crawford Depo., pp. 23, 25. Employees are able to received additional training, as well as complete or update paperwork on the CBL system. *Id.* Collins could use the CBL system himself. *Id.*

The job duties of a sales associate at Wal-Mart stores include stocking shelves, cleaning and straightening shelves, general cleaning, and assisting with customers and returns. Skarpac Depo., p. 59. Within two weeks of his hire, Collins was experiencing difficulties communicating with his supervisor, whom Collins described as a "very gruff" person. Collins Decl., ¶ 13. He told his wife that he was confused by different managers assigning him to different and often conflicting tasks. *Id* at ¶15. Mrs. Collins told Crawford that Collins had a disability, was unable to communicate or multitask, and had a problematic memory. J. Collins Depo., pp. 17-18. Crawford told Mrs. Collins that Collins needed to "speak up for himself" and that he (Crawford) would look into it. *Id* at 20. Mrs. Collins met with Crawford at least once a month for the remaining six months of 2001, expressing these same concerns. *Id* at 22, 26.

At his first 90-day review in August 2001, Collins received an overall performance appraisal of "meets expectations," but was "below expectations" on "assists customers in finding merchandise." Def. Ex. 11; Collins Depo., p. 57.

In April 2002, Collins received an annual performance appraisal. Def. Ex. 12. Although Collins received an overall rating of "meets expectations," his managers noted that he needed to follow his department manager's direction. *Id.*

In May 2003, Collins received another annual performance evaluation.  Def. Ex. 13.
Although his overall performance was "meets expectations," his managers noted that he needed
"to learn about his department instead of finding someone who does."  *Id* at 2.  Wal-Mart also
warned Collins that he needed "to improve time for tasks given" and to "work on . . . following
instructions in a timely manner."  *Id*.  He also was cautioned about leaving early without
permission.  *Id* at 3.

Collins' performance reviews reflect that he was consistently customer-friendly, always
meeting or exceeding the requirement to practice the "10-Foot Attitude," which is described in
the Associate Handbook as one of the components of Wal-Mart's customer service philosophy:

> One way of meeting your customers' needs and exceeding their
> expectations is practicing aggressive hospitality or "meet 'em
> and greet 'em."  For example, if a customer asks you where a product
> is:
> · Meet the customers' needs by showing them where the department is.
> · Exceed their expectations by taking them to the product.
>
> Make customers feel welcome – smile, look them in the eye, and greet
> everyone who comes within ten feet of you.  This is called the "10-Foot
> Attitude."  If at all possible, call the customer by name.

Def. Ex. 10, p. 14; *see also* Def. Exs. 11, 12 and 13.

**B.  People Greeter Position**

In 2001 Collins began filling in as a People Greeter when other employees were absent
from work or needed to take a break.  Collins Depo., p. 85;  Collins Decl., ¶ 13.  Most of the time
when working in the front, he worked with another People Greeter.  Collins Decl., ¶ 13.  His
reading abilities allowed him to read receipts and compare them to what is in a customer's cart.
*Id*.

In early 2004, Collins signed a document that he would receive training for the People Greeter position and that his position changed effective April 17, 2004, from a Garden Associate to a People Greeter. Def. Exs. 14, 15. In addition, the personnel file contains a People Greeter job description revised May 2005 which Collins signed on February 16, 2006. Def. Ex. 17. However, Collins testified that he did not understand what he signed, never was "permanently" a People Greeter, and was "not really" a People Greeter but only filled in for others on occasion. Collins Depo., pp. 85, 93; Collins Decl., ¶¶ 20, 21, 25. In addition, Skarpac never saw him working as a People Greeter in 2006. Skarpac Depo., pp. 93, 97. As a result, Skarpac believes that the People Greeter job description was a mistake by a new personnel manager trying to bring Collins' file up-to-date. *Id* at 94, 97.

According to the job description, the People Greeter position has the following essential functions:

> Constantly monitors entrances and exits for signs of shrink and potential security risks, which involve:
> • Physically and visually verifying purchase of unbagged merchandise;
> • Providing shopping carts to Customers by pushing or pulling up to 10 pounds of pressure;
> • Demonstrating knowledge of and proficiency with security tag deactivation, security log, and cash register receipts, requiring writing, reading, and visually verifying small print using various media;
> • Frequently lifting, placing, and deactivating items weighing up to 10 pounds without assistance, and regularly lifting merchandise over 10 pounds with team lifting;
> • Monitoring areas for signs of shrink or potential security risks and contacting management or In-Store Loss Prevention when appropriate;
> • Visually reading and verifying small printed written documents and on equipment, using fine motor skills, including grasping, turning, and manipulating while marking returned items and responding to alarms; and
> • Demonstrating an understanding of and effectively following all Company policies and procedures, such as Customers with service animals and/or other special needs and Customers needing access to the facility.

Def. Ex. 17.

11 - FINDINGS AND RECOMMENDATION

One of the essential functions is to greet customers as they come into the store. Skarpac Depo., pp. 26-27. However, the People Greeter position is also essential to Wal-Mart's security and loss prevention plan because it provides a mechanism for checking a customer's receipt against the merchandise that the customer is carrying out of the store. *Id* at 62; Crawford Depo., pp. 21-22.

### C.  Day Maintenance Associate Position

Effective April 17, 2004, Collins was moved to a Day Maintenance Associate position. Def. Ex. 19; Collins Depo., p. 87. Generally, the responsibilities of a Day Maintenance Associate include cleaning the restrooms, emptying the trash, cleaning any spills that occur in the store, cleaning the bottle return area, doing windows, and sweeping. Def. Ex. 18; Skarpac Depo., pp. 82-83. However, depending on what is happening on any particular day, the duties may vary to meet the needs of the store. *Id* at 84-85; Schey Decl., ¶ 6.

In May 2004, Collins received another annual performance evaluation. Def. Ex. 16; Collins Depo., p. 73. Although he received an overall rating of "meets expectations," he was rated "below expectations" in "shows sense of urgency with all assignments." Def. Ex. 16. His managers commented that he needed to show more of a "sense of urgency" about doing his tasks. *Id*; Collins Depo., pp. 74-75.

In January 2005, Patterson assigned him to clean trailers and then other assistant managers falsely accused of hiding in the empty trailers. Collins Decl., ¶ 23. Different managers would assign him different tasks, and other managers would not know what he was supposed to be working on. *Id*.

In March 2005, Collins received an annual performance appraisal. Def. Ex. 19. He received an overall rating of "meets expectations." *Id*. However, the performance appraisal noted as "Areas for Improvement" that Collins needed to "stay in work area," "pick up the pace when doing a project," "work on making sure that breaks are taken per policy not whenever you feel one is needed," and "make sure that the time on the clock is used correctly." *Id*.

**VI.  Discipline and Termination**

    **A.  Verbal Coaching**

        In early 2006, Schey became assistant manager in charge of the front end.  Schey Decl., ¶ 4.  In February 2006, she received complaints from other associates that Collins was not working.  *Id* at ¶ 6.  Schey spoke with Collins, who informed her that he felt he was being pulled in different directions by different managers.  *Id*.  Being asked to multitask is typical for Wal-Mart associates; often they are asked to fill in when the store has needs in other areas.  *Id*; Crawford Depo., p. 33.

        At about that same time, Mrs. Collins told Schey that Collins had a disability and "was going to need to be worked with and understood."  J. Collins Depo., pp. 86-87.  Schey told Mrs. Collins that she had a sister with Down Syndrome and understood individuals with special needs.  *Id* at 87; Schey Decl., ¶ 12; Schey Depo., p. 18.  In order help Collins succeed, Schey told Mrs. Collins that she was going to try to "isolate" Collins and have him "concentrate on doing one thing."  J. Collins Depo, p. 87.

        Because Collins was not completing his tasks, Schey, working with Collins' customer service manager, Bryan Prosser ("Prosser"), significantly reduced Collins' responsibilities as a Day Maintenance Associate to focus on only two duties, washing windows and emptying the trash, and if he had time, cleaning the bottle return room.  Schey Decl., ¶ 8; Prosser Decl. ¶¶ 5-6.  However, Schey never provided Collins with a document specifically listing these three tasks.  Snyder Decl., Ex. B ("Supp. Schey Depo."), p. 35.

        On February 9, 2006, Schey and Prosser issued Collins a verbal coaching for not completing his assigned tasks "of cleaning the windows up front, and emptying the trash up front."  Def. Ex. 21; Schey Decl., ¶ 8; Collins Depo., pp. 108-09, 112.  As for expected behavior, the Coaching for Improvement form stated that Collins "is to clean all windows up front, empty the trash up front, and tidy up the front of the bottle return area only – this completed before he

goes home.  He is to also communicate with either a CSM, or a member of management . . .

before he goes hom[e] to ensure his job is completed."  *Id.*

That same day, Schey sent an email to the other managers, as well as to Welte and

Skarpac, asking them to refrain from moving Collins away from those tasks which he needed to

complete every day before going home.  Def. Ex. 20; Schey Decl., ¶ 6; Def. Ex. 40 ("Schey

Depo."), p. 38.  However, Collins was told by other managers to clean windows when he had

time because he was required to assist customers with carrying out heavy or bulky purchases.

Collins Decl., ¶ 27.  Schey did not know if other managers followed her instructions and does

not remember checking with them.  Supp. Schey Depo., pp. 39-40.

**B.  <u>Written Warning</u>**

Less than one week later on February 16, 2006, Schey and Prosser issued Collins a

written warning that he "still isn't finishing his assigned task of windows, trash and the bottle

room.  [O]n 2-16-06 by 1:45pm Paul has been i[n since] 7am, and has yet to even start doing his

job of windows and trash." Def. Ex. 21; Schey Decl., ¶ 8; Collins Depo., p. 112.  It listed his

expected behavior as finishing "his task everyday of windows, trash, and the front of the bottle

room everyday."  Def. Ex. 21.  Collins acknowledged this warning and added the comment:  "I

will do my job well, and finish my job."  *Id.*

On April 3, 2006, Collins received an annual performance appraisal that he "meets

expectations."  Def. Ex. 23.  As "strengths," it noted that he "is doing a very good job at his daily

tasks now."  *Id* at 2.  However, under "Areas for Improvement," Schey and Prosser noted that he

"needs to stay focused on doing his windows up front and keeping the front clean.  Paul needs to

work on taking breaks and lunches when he needs to and to make sure he takes the right amount

of time for them."  *Id.*

**C.  <u>Decision-Making Day</u>**

By July 2006, Schey and Prosser noticed that Collins regularly failed to complete his two

daily tasks.  Schey Decl., ¶ 10; Prosser Decl., ¶ 8.  Both supervisors noticed him visiting with his

wife when she shopped at the store, taking excessive time on breaks, and generally not getting his work done.  *Id.*  They also noticed him sitting and doing nothing in the sprinkler room while on the clock.  Schey Decl., ¶ 10; Prosser Decl., ¶ 9.  Prosser regularly asked Collins if there was anything he needed to enable him to get his job done.  Prosser Decl., ¶ 10.  Collins responded, if at all, that he needed another squeegee, or a new duster.  *Id.*  Prosser would retrieve these items from the supply room in the back of the store and give them to Collins.  *Id.*

During the first week of July 2006, Collins was called in to a meeting with the "grocery" co-manager, Paul Crawford, and assistant manager Patterson.  Collins Depo., p. 97; Def. Ex. 30. Despite Schey's previous instruction to Collins to focus on cleaning the windows and removing trash in the front of the store, these managers told Collins that "[w]indows are not most important" and that they "want[ed] it to feel like a family [and have him] join the maintenance crew."  Collins Depo., p. 97.  At that time, they presented him with a job description outlining the job responsibilities of a Day Maintenance Associate.[6]  *Id*; Def. Ex. 18.  Collins reviewed the job description with his wife and returned it to Wal-Mart.  Collins Depo., p. 97.  However, he did not understand the form and followed the managers' instructions as to which box to mark. Collins Decl., ¶ 31.

Because Collins was not sticking to his assigned schedule and was taking unauthorized breaks whenever he felt like it in violation of policy, Schey gave Collins a Decision-Making Day coaching on July 18, 2006.  Def. Ex. 24; Schey Decl., ¶ 10; Collins Depo, p. 120.  That discipline was based on the following observations:

> On Monday, July 17th while Paul was on the clock [he] visited with his wife, and stood outside the building for a good ten min[utes] with his wife, and didn't start his job till 8:45 am, after clocking in at 7:09am.  Was observed sitting in the sprinkler room doing nothing, and also then didn't clock out until 4:14 pm, which has now given him unauthorized overtime. On 7-18-2[006 he had no]t been observed doing any of his jobs, or even maintenance jobs."

---

[6] Wal-Mart contends that due to an oversight, Collins did not sign the job description for this position until July 6, 2006.  In a periodic personnel file audit, it was noticed that Collins did not have the correct job description in his file, and the mistake was corrected.  Skarpac Depo., p. 99.

Def. Ex. 24.

Collins disagreed with this discipline because no one had ever told him not to help his wife with her groceries. Collins Decl., ¶ 32. He helped customers with groceries all the time. *Id*. Given his earlier conversation with Paul Crawford and Patterson, Collins was confused when he was reprimanded for not doing the windows. *Id*.

Schey suspended Collins from work and instructed him to prepare a written statement to the assistant manager by July 21, 2006, explaining why he should be allowed to keep his job. *Id* at ¶ 33; Def. Ex. 24. Because he lacked the ability to express himself adequately in writing, he had his wife draft an explanatory letter for him. Collins Decl., ¶ 33; Snyder Decl., Ex. G. Schey did not see this letter. Supp. Schey Decl., p. 55.

On July 21, 2006, Mrs. Collins went to the store and spoke with Skarpac. Skarpac Depo., pp. 110-11. She told him that Collins was disabled, needed a list of tasks and was confused by conflicting orders from managers. *Id* at 111; J. Collins Decl., ¶ 5. Skarpac responded that Collins was taking an unusually long time in his daily tasks because he stopped and talked to everyone he encountered. *Id.* He also said that anyone else would do the tasks in half the time. J. Collins Decl., ¶ 5. She responded "Yeah, so?" and at that point felt that there was nothing more she could say. *Id*.

### D. <u>Termination</u>

A few days later, Collins returned to work and was placed back in the front to clean windows. Collins Decl., ¶ 35. However, he also worked on other tasks when asked, including maintenance and assisting customers carrying out large and bulky items. *Id*. Schey did not know whether other managers were instructing Collins to perform more than his three assigned daily tasks. Supp. Schey Depo, pp. 56-57, 75. However, she noticed that he did not complete those tasks and was not taking his lunch when scheduled. *Id* at 65, 67.

Collins was terminated on August 31, 2006.  Schey Decl., ¶ 11; Def. Ex. 25.  Schey states that this decision was ultimately made by Welte, the store manager, after she spoke with him about Collins' job performance.  Schey Depo., p. 58; Supp. Schey Depo., pp. 12, 59-60.  However, the Exit Interview sheet  is signed by Skarpac, Schey, and Prosser, and not Welte.  Def. Ex. 25.  That sheet lists the reasons for termination as "unauthorized overtime; inability to complete job tasks in a timely matter [sic]; not following his schedule."  *Id.*  At the Exit Interview, Collins recalls the managers telling him that he was not completing his job in a timely fashion.  Collins Decl., ¶ 36.

**FINDINGS**

## I.  Collins' Allegations

Although he alleges only two claims under the ADA and the Oregon Rehabilitation Act, Collins asserts various theories of liability based on a variety of adverse actions.  Broadly construed, Collins alleges claims for:  (1) discrimination based on theories of: (a) disparate treatment; (b) hostile work environment ("harassment"); and (c) failure to engage in the interactive process; and (2) retaliation.  Complaint, ¶¶ 30-31, 37, 41.

At oral argument, Collins clarified that he is not pursuing any harassment claim and that his discrimination claims are premised on Wal-Mart's:  (1) failure to engage in the interactive process; (2) failure to provide a reasonable accommodation; and (3) termination of his employment.  His retaliation claims are premised on Wal-Mart's termination of his employment after his letter request for accommodation dated July 20, 2006, and his wife's oral request to Skarpac on July 21, 2006.

///

## II.  Burden Shifting Framework

Claims for disparate treatment and retaliation under the ADA may be analyzed using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973).  *See Raytheon Co v. Hernandez*, 540 US 44, 52-54 (2003) (ADA disparate treatment);

*Brown v. City of Tucson*, 336 F3d 1181, 1186-87 (9th Cir 2003) (ADA retaliation).  Oregon

courts have rejected the burden-shifting framework.  *Callan v. Confed. of Or. Sch. Admins.*, 79

Or App 73, 77 n3, 717 P2d 1252, 1254 n3 (1986).  However, the Ninth Circuit deems this

analysis to be a matter of federal procedural law applicable to employment discrimination

claims, including those based on Oregon's employment discrimination law.  *Snead v. Metro.*

*Prop. & Cas. Ins. Co.*, 237 F3d 1080, 1092 (9th Cir 2001).  Moreover, Oregon's employment

discrimination statutes are generally construed consistently with federal law.  *See* ORS 659A.139

(claims brought under the Oregon law are "construed to the extent possible in a manner that is

consistent with . . . similar provisions of the [ADA].").  Therefore, each of Collins' disparate

treatment and retaliation claims must be analyzed under *McDonnell Douglas*.

        As set out under *McDonnell Douglas,* a plaintiff must first establish a *prima facie* case of

discrimination.  To establish a *prima facie* case of discrimination in violation of the ADA by an

employer, a plaintiff must prove:  (1) that he or she is a qualified individual with a disability;

(2) that he or she has suffered an adverse employment action; and (3) that a causal connection

exists between the adverse employment action and the disability.  *Hutton v. Elf Atochem N. Am.,*

*Inc.*, 273 F3d 884, 891 (9th Cir 2001); *see also Kennedy v. Applause, Inc.,* 90 F3d 1477, 1481 (9th

Cir 1996).  To establish a *prima facie* case of retaliation under the ADA, plaintiff must show:

(1) that he engaged in or was engaging in activity protected by the ADA; (2) the employer

subjected him to an adverse employment decision; and (3) there was a causal link between the

protected activity and the employer's action.  *Pardi v. Kaiser Found. Hosps.*, 389 F3d 840, 849

(9th Cir 2004) (citation omitted).  The causal connection element may be met based on the

temporal proximity between the protected activities and the adverse actions.  *Id* at 850.  The

requisite degree of proof necessary to establish a *prima facie* case of discrimination on summary

judgment "is minimal and does not even need to rise to the level of a preponderance of the

evidence."  *Wallis v. J.R. Simplot Co.,* 26 F3d 885, 889 (9th Cir 1994).

Once a *prima facie* case is presented by a plaintiff, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 US at 802.

The plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason was pretextual. "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F3d 1115, 1127 (9th Cir 2000) (citation omitted). In considering these, "[e]vidence already introduced to establish the prima facie case may be considered." *Yartzoff v. Thomas*, 809 F2d 1371, 1377 (9th Cir 1987). "When that evidence, direct or circumstantial *consists of more* than the [prima facie] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F3d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). In short, Collins must do more than simply "establish a *prima facie* case and deny the credibility of [Wal-Mart's] witnesses." *Id* (citation omitted).

**III.  Discrimination Claims**

    **A.  Collins' *Prima Facie* Case**

        **1.  Qualified Individual With a Disability**

To prove that he is a qualified individual with a disability, Collins must prove that he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 USC § 12111(8);  ORS 659A.115. This showing must be made as of the time of the termination. *Kaplan v. City of N. Las Vegas*, 323 F3d 1226, 1230 (9th Cir 2003), *cert. denied*, 540 US 1049 (2003). An "individual with a disability" is someone who:  (1) has a physical or mental

impairment that substantially limits one or more of the individual's major life activities; (2) has a record of the impairment; or (3) is regarded as having an impairment.  42 USC § 12102(2)(A); ORS 659A.100(1)(c).

For the purposes of this motion, Wal-Mart concedes that Collins suffers from a disability, but disputes that he was "qualified" for either the Day Maintenance Associate position which he held at the time of his termination or the People Greeter position which he desired.  With respect to the Day Maintenance Associate position, Wal-Mart asserts that Collins repeatedly failed to perform even his limited tasks, took unauthorized breaks, accumulated unauthorized overtime, and took breaks in unauthorized locations, resulting in his termination.

For purposes of analyzing the essential functions of a job under the ADA, evidence that accommodations were made so that an employee could avoid a particular task merely shows the job could be restructured, not that the function was nonessential.  *Phelps v. Optima Health, Inc*., 251 F3d 21, 25-26 (1st Cir 2001).  It is undisputed that Collins could not perform all of the essential functions of the Day Maintenance Associate job without an accommodation.  Thus, in order to satisfy his *prima facie* burden, Collins need prove only that he could perform that job with the accommodations provided by Wal-Mart.

Collins has submitted evidence that he was able to perform his restructured job as a Day Maintenance Associate position.  With two minor exceptions,[7] his performance reviews, including the performance review prepared between the February 16 written coaching and the July 18 Decision-Making Day coaching, uniformly state that Collins had met or exceeded expectations in all areas.  Def. Exs. 11-13, 16, 19, 23.  In fact, the April 3, 2006 performance review notes that "Paul is doing a very good job at his daily tasks now."  Def. Ex. 23.  Wal-Mart disagrees, as evidenced by its multiple disciplinary actions against Collins.  However, as discussed below, Collins disputes whether discipline culminating in termination was warranted.

_____

[7]  The two exceptions are a notation that Collins was "below" expectations in the area of assisting customers with finding merchandise on his 90-day review (August 15, 2001) (Def. Ex. 11) and in the area of showing a "sense of urgency with all assignments" on his 2003-04 annual review (Def. Ex. 16).

That dispute must be resolved at a later stage of the analysis. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F3d 654, 660 (9th Cir 2002) (minimal *prima facie* showing regarding job performance satisfied by employee's self-assessment of performance).

With respect to the People Greeter position, Wal-Mart argues that Collins never performed that job full-time, never performed it successfully, and could not perform the essential function of loss prevention. Although Collins may never have performed that job full-time, he did occasionally fill in for others without any apparent difficulty.

Wal-Mart agrees that Collins was good at talking with customers. However, it contends that Collins lacked the reading ability to "compare[] merchandise to purchase receipt," which is one of the essential functions of the position listed in the job description. Def. Ex. 17. Collins claims that despite his trouble reading and understanding sentences and paragraphs of material, he can perform the essential function of reading receipts and comparing them to items in customers' carts. Wal-Mart disagrees, citing Collins' repeated assertions that he is unable to read, understand or retain information and his limited duties when working in his wife's business. Although Collins' reading and comprehension ability may be limited, the evidence is disputed as to the extent of this limitation and how it affects his ability to successfully perform the essential functions of the People Greeter position. At this point, Collins has submitted sufficient evidence that he had the requisite reading ability to satisfy his *prima facie* burden.

Wal-Mart also argues that Collins could not perform another essential function of the position listed on the job description to "constantly monitor entrances and exits for signs of shrink and potential security risks." Def. Ex. 17. As proof, it points to Mrs. Collins' recollection of her conversation with store manager, Pickle, in late 2001 or early 2002 when she requested that Collins be placed at the front door as a People Greeter. J. Collins Decl., ¶ 8. Pickle refused because of "'security concerns,' he just said he did not want Paul to be hurt." *Id*. Wal-Mart interprets this testimony as an admission that Mrs. Collins was told her husband could not

perform the People Greeter position.  To the contrary, this testimony indicates only that Pickle was concerned about Collins' safety, not necessarily about loss prevention.

Therefore, Collins satisfies the first prong of his *prima facie* case that he was qualified to perform both the Day Maintenance Associate job, as restructured to accommodate him, and the People Greeter position.

## 2. Adverse Employment Actions

An adverse employment action is an "employer action[] that would have been materially adverse to a reasonable employee . . . . [T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 US 53, 57 (2006).

Collins identifies the following as adverse actions taken against him:  (1) failure to engage in the interactive process; (2) failure to provide a reasonable accommodation; and (3) termination of his employment.  It is undisputed that Wal-Mart terminated Collins' employment which is an adverse employment action.  The remaining issues are whether a failure to engage in the interactive process is a separate adverse employment action and whether Collins has submitted evidence that Wal-Mart failed to provide him a reasonable accommodation.

### a. Failure to Engage in Interactive Process

Collins contends that a failure to utilize an informal, interactive process to make an individualized assessment of his needs and abilities constitutes a separate violation under the ADA and Oregon law.  That contention is based on an inaccurate reading of the law.

The ADA's implementing regulations state that "it may be necessary" for an employer "to initiate an informal, interactive process" with a disabled employee in order to determine an appropriate accommodation.  29 CFR § 1630.2(o)(3).  The Ninth Circuit has construed that regulation as imposing a mandatory obligation on an employer.  *Humphrey v. Mem'l Hosps. Ass'n*, 239 F3d 1128, 1137 (9th Cir 2001), *cert. denied*, 535 US 1011 (2002), citing *Barnett v. U.S. Air, Inc.*, 228 F3d 1105, 1111-14 (9th Cir 2000) (*en banc*) (citing cases), *vacated on other grounds*

*sub nom, U.S. Airways, Inc. v. Barnett*, 532 US 970 (2001). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Id* at 1139. Employers "who fail to engage in the interactive process in good faith, face liability . . . if a reasonable accommodation would have been possible." *Id* at 1137-38 (citation omitted). Thus, liability depends on finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions. *Id*.

In other words, contrary to Collins' contention, Wal-Mart's failure to engage in the interactive process does not automatically subject it to liability under the ADA. Instead, Wal-Mart is liable only if a reasonable accommodation otherwise would have been possible without undue hardship.

Oregon now has an equivalent regulation imposing a mandatory obligation on the employer to engage in an interactive process, OAR 839-006-0206. However, that regulation did not take effect until February 1, 2007, after the date of Collins' termination. Def. Ex. 32. Before the law changed in Oregon, an argument was made in *Stamper v. Salem-Keizer Sch. Dist.*, 195 Or App 291, 295-99, 97 P3d 680, 682-84 (2004), that the ADA regulation, 29 CFR § 1630.2(o)(3), and the federal courts' interpretation of it should be incorporated into Oregon law by reason of ORS 659A.139. That statute requires "similar terms" in Oregon law to be "construed in a manner that is consistent with any similar provision of" the ADA. The court expressed concern, but did not decide, the extent to which ORS 659A.139 requires Oregon courts to follow federal case law decided or regulations adopted after that statute was enacted. *Id*, 195 Or App at 298 n4, 97 P3d at 684 n4. Instead, it concluded that ORS 659A.139 had "no relevance to the question presented" because "the relevant question under both federal and Oregon law is the same, namely, whether the employer could have reasonably accommodated the employee but did not." *Id* at 299, 97 P3d at 684. Thus, even if Oregon law imposes no obligation on an employer to engage in an

interactive process, an employer could still be liable under Oregon law, as it is under the ADA, for failing to provide a reasonable accommodation.

Therefore, a failure to engage in the interactive process is not an adverse employment action by itself. Even if Wal-Mart failed to engage in the interactive process, "summary judgment is available only if a reasonable finder of fact *must* conclude that 'there would in any event have been no reasonable accommodation available.'" *Dark v. Curry County*, 451 F2d 1078, 1088 (9th Cir 2006) (emphasis in original), citing *Morton v. United Parcel Serv., Inc.*, 272 F3d 1249, 1256 (9th Cir 2001). Whether Wal-Mart could reasonably have accommodated Collins is discussed next.

### b. Failure To Accommodate Disability

The ADA establishes that an employer discriminates by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified . . . employee, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 USC § 12112(5)(A). In order to establish a reasonable accommodation claim, the employee bears the burden of establishing the existence of a specific reasonable accommodation that the employer failed to provide. *Memmer v. Marin County Courts*, 169 F3d 630, 633 (9th Cir 1999). The employee "need only show that an 'accommodation seems reasonable on its face, *i.e.* ordinarily or in the run of cases." *U.S. Airways, Inc.*, 535 US at 401-02. "Job restructuring" may be a reasonable accommodation required of an employer. 29 USC § 1630.2(o)(2)(ii).

Wal-Mart contends that if Collins or his wife made any request for an accommodation, it was to assign him a single set of managers. Wal-Mart deems this requested accommodation to be unreasonable given the normal operation of the store which requires a regular rotation of managers. However, Collins appears to contend that his disability could be reasonably accommodated by assigning him limited tasks without being pulled in different directions by different managers. In fact, Schey provided him with such an accommodation in February 2006

by reducing his normal duties as a Day Maintenance Associate to three daily tasks of washing the windows, emptying trash, and, if he had time, cleaning the bottle return area, and by asking other managers to refrain from giving him additional projects. However, Schey never followed up and asked the other managers if they were giving Collins conflicting orders. In addition, Wal-Mart's "10 Foot Attitude" requires its employees to help customers if asked.

Once Wal-Mart reasonably accommodated Collins by restructuring his job, then the critical issue is whether Collins could perform that job. The accommodation of assigning Collins limited tasks failed, according to Collins, because Wal-Mart failed to adequately implement it by ensuring that all of its managers complied with Schey's request. Collins places the blame on Wal-Mart's failure of communication by the right hand not knowing what the left hand was doing, while Wal-Mart places the blame on Collins for not standing up for himself and telling other managers that he had not yet completed his assigned tasks. Who should bear the blame cannot be resolved on summary judgment.

As another reasonable accommodation, Collins points to the People Greeter position which he believes he could have performed full-time. As discussed above, it is disputed whether Collins could perform the essential functions of that job without any accommodation.

Collins also suggests that if Wal-Mart truly believed that he could not adequately check receipts, he still could have performed the People Greeter job with the accommodation of coupling him with another People Greeter who was an adequate reader. However, Wal-Mart is not required to eliminate an essential function from a job's requirements or find someone else to perform that function. *Dark*, 451 F3d at 1089; *Honstein v. Metro West Ambulance Serv., Inc.*, 193 Or App 457, 461-62, 90 F3d 1030, 1032-33 (2004), *rev. denied*, 337 Or 327, 99 P3d 290 (2004). The record does not reveal whether Wal-Mart allowed employees in People Greeter positions to work in pairs, with only one of the pair performing the loss prevention responsibilities. Such evidence may be sufficient to establish that loss prevention was not an essential job function. 29 CFR § 1630.2(n)(3) (two of the factors taken into account in

25 - FINDINGS AND RECOMMENDATION

determining whether a particular job function is essential are "work experience of past incumbents in the job" and "current work experience of incumbents in similar jobs"). Alternatively, it may be sufficient to prove that People Greeters working in pairs is a reasonable accommodation.

In sum, the issues of what accommodation Collins requested and whether that requested accommodation was reasonable present material issues of fact. Therefore, Collins has met his *prima facie* burden of proving an adverse employment action based on a failure to reasonably accommodate his disability.

### 3.    Causation

Collins asserts that he and/or his wife made numerous requests for accommodations for him during the years that he worked at Wal-Mart. In particular, he asserts that on July 21, 2006, just over a month before his termination, Mrs. Collins asked Skarpac to accommodate Collins by providing him with a list of tasks and told him about the conflicting instructions he was receiving from managers. Skarpac's only response was to remark that Collins was slower than other people. As the Facility Manager, Skarpac signed the termination document (Exit Interview) along with Prosser and Schey. Def. Ex. 25.

By the time of Mrs. Collins' request to Skarpac on July 21, 2006, Wal-Mart had already accommodated Collins by limiting the number of tasks he was required to perform. However, the the evidence is disputed as to whether that limitation was adequately implemented. According to Collins, had Schey done more to ensure that other managers would follow her directive, he would have successfully completed his daily tasks. A reasonable juror who believes Collins could find that at least part of Wal-Mart's motivation for failing to accommodate and terminating him was his disability that caused him to work more slowly than other employees.

///

///

### C.    Wal-Mart's Justification

Wal-Mart has produced evidence that despite his limited job duties and prior warnings of performance deficiencies, Collins was unable to complete his tasks and also failed to adhere to his lunch schedule.  Poor work performance and violation of employment policies are legitimate justifications for the actions taken by Wal-Mart.  Therefore, Wal-Mart has adduced a legitimate reason for terminating Collins.

### D. Pretext

As proof of pretext, Collins relies primarily on timing.  He received no discipline over his five years of employment until February 2006, just a few months prior to his termination.  His discipline coincided with a change in supervisors when Schey became the assistant manager in charge of the front end.  Despite the verbal and written warnings from Schey in February 2006, he received a good performance evaluation in April 2006.  As a result, the July 18, 2006 Decision-Making Day coaching came out of the blue.  Then he returned to work for a month prior to his termination with no indication that he was not performing as expected.

Second, Collins relies on the failure of Wal-Mart to implement its accommodation. Instead of being allowed to complete his limited tasks, he received conflicting instructions from the managers and felt obliged to do what he was told.  In fact, one of his strengths noted on the April 2006 evaluation was that he "does do what he is asked to do."  Def. Ex. 23, p. 2.  On July 18, 2006, two managers told him that cleaning windows was not his most important task which added to his confusion.  Schey did not monitor the other managers to ensure that they did not prevent him from completing his daily tasks.  To compound his confusion, he was given two different job descriptions to sign, one for a People Greeter which he signed on February 16, 2006, and another for a Day Maintenance Associate which he received on July 18, 2006.  Giving him the People Greeter job description appears to have been an administrative error and giving him the Day Maintenance Associate job description appears to have been part of a periodic personnel audit.  However, based on Collins' limited abilities, it is reasonable to infer that receipt of these job descriptions, which he had to sign, confused him as to his assigned job duties.

27 - FINDINGS AND RECOMMENDATION

Wal-Mart disputes that Collins was confused, pointing to his written responses to the verbal and written warnings and Decision-Making Day coaching, as well as his acknowledgment in his July 20, 2006 letter that he "know[s] the places to check to do the chores on the list that manager Jim and Co-Manager Paul gave me the other day to sign."  Snyder Decl., Ex. G.  This evidence shows that Collins was aware of his limited tasks.  However, his letter also states that: "I always try to do a good job when the managers ask me to do something for them also."  *Id.* This statement is consistent with the Decision-Making Day coaching that he "is to do his assigned duties, unless otherwise instructed [by his] supervisor or member of management."  Def. Ex. 24, p. 1.  If Collins then received conflicting instructions from managers that caused him not to complete the three daily tasks assigned by Schey, his termination for that reason could be deemed pretextual.

Of course, the reasons for his termination include more than his alleged inability to timely complete his job duties.  It is also based on unauthorized overtime and not following his schedule. However, the record is devoid of evidence substantiating those deficiencies after the Decision-Making Day coaching, other than Schey's testimony, which Collins disputes, that Collins' performance did not improve.

Thus, factual issues preclude deny summary judgment to Wal-Mart on the disability discrimination claims.

## IV.  Retaliation Claims

### A.  Collins' *Prima Facie* Case

Collins has established a *prima facie* case of discrimination.  First, as indicated above, he has sufficiently demonstrated that he is a "qualified" individual with a disability.  Second, there is no question that he was terminated, which is an adverse employment action.

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citations omitted).  "[A] prima facie case may

be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory [activity]." *Yartzoff v. Thomas*, 809 F2d 1371, 1376 (9th Cir 1987).  The showing required to meet this burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the plaintiff had engaged in the protected activity."  *Cohen*, 686 F2d at 796.

Collins relies wholly on the proximity of his termination to the request by his wife about a month earlier to establish the causal link for his *prima facie* case. The Ninth Circuit has held that "when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred."  *Passantino v. Johnson & Johnson Consumer Prods., Inc*, 212 F3d 493, 507 (9th Cir 2000) (citing cases).  It is reasonable to infer from the short period of time that passed between Mrs. Collins' request for accommodation (July 21, 2006) and Collins' termination (August 31, 2006), that the termination decision was motivated by retaliatory intent.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F3d 1054, 1065 (9th Cir 2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity."); *see also Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003) ("Depending on the circumstances, three to eight months is easily within a time range that can support an inference of retaliation."); *Allen v. Iranon*, 283 F3d 1070, 1078 (9th Cir 2002) ("[A]n eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory.") (citation omitted).

Thus, Collins satisfies his *prima facie* case for disability retaliation.

///

///

### B.  **Wal-Mart's Justification**

As discussed above, Wal-Mart had submitted legitimate business reasons to terminate Collins.

### C.  **Pretext**

Wal-Mart argues that Collins' retaliation claim fails due to lack of evidence beyond timing to show causation.  Temporal proximity, by itself, is not sufficient to establish pretext.  *Hashimoto v. Dalton*, 118 F3d 671, 680 (9th Cir 1997), *cert. denied*, 523 US 1122 (1998).  This court agrees that Collins has failed to adduce sufficient evidence of pretext of retaliation to survive summary judgment.

Of the managers involved in Collins' termination, there is no evidence to infer that Schey had any retaliatory motive.  To the contrary, she was instrumental in attempting to accommodate Collins by limiting his job duties and made a sympathetic remark to Mrs. Collins about a child with Down Syndrome.  Furthermore, as Wal-Mart correctly notes, if Welte was the decision-maker, no evidence links his conduct to a request by accommodation since neither Collins nor his wife ever asked Welte for an accommodation.

However, Collins does have some evidence with respect to Skarpac.  In response to Mrs. Collins' request for an accommodation, Skarpac remarked that Collins was slow.  Collins was then terminated.  The only document concerning the termination, the Exit Interview, bears Skarpac's name.  Thus, Mrs. Collins' request for accommodation to Skarpac is linked to the termination in which Skarpac played some role.  The issue is whether the one comment by Skarpac is sufficient evidence of retaliatory intent to save this claim.  This court concludes that it is not.  At best, Skarpac opined that Collins' disability made him work more slowly than others.  This is sufficient to support a claim for discrimination against a person with a disability, but does not translate easily into a motive to retaliate for requesting an accommodation.  This is especially true here where Wal-Mart tried, albeit unsuccessfully, to accommodate Collins.

As a result, Wal-Mart's motion for summary judgment should be granted against the disability retaliation claims.

### V.  **Punitive Damages**

Collins seeks recovery of punitive damages on both claims under the ADA and Oregon law.  Complaint, ¶¶ 32, 41, 46.  In order to recover punitive damages with respect to his ADA claim, Collins must show that Wal-Mart "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his] federally protected rights."  42 USC § 1981a(a)(2) and (b)(1).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. . . . [Thus] in the context of § 1981a, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad v. Am. Dental Ass'n*, 527 US 526, 535-36 (1999).  Cases interpreting *Kolstad* indicate that a finding of intentional discrimination is sufficient to establish liability for punitive damages: "[A]lthough egregious conduct could be evidence of intent to break the law, such conduct [is] not required to establish punitive damages liability.  Thus, in general, intentional discrimination is enough to establish punitive damages liability."  *Passatino*, 212 F3d at 515 (citations omitted). Because this court concludes that Collins has submitted sufficient evidence to proceed with his claim of intentional discrimination, his claim for punitive damages likewise may proceed.

Defendants cite ORS 31.730(1) in support of their request to strike the claims for punitive damages.  That statute provides as follows:

> Punitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.

This statute was originally enacted in 1995 as part of a state tort-reform movement which restricted recovery in personal injury actions.  1995 Or. Laws c. 688 § 2.  The parties have not provided any analysis of how this statute should be interpreted in light of ORS 659A.885(2) which now allows punitive damages awards in cases involving intentional disability discrimination.  However, as noted earlier, Oregon's disability discrimination laws must

31 - FINDINGS AND RECOMMENDATION

construed to the extent possible in a manner consistent with similar provisions of the ADA.  ORS
659A.139.  At this juncture, this court concludes that the better course is to allow punitive
damages to remain in the state law discrimination claim for the same reasons it is allowed to
remain on the ADA claim.  Accordingly, to the extent Wal-Mart's motion seeks summary
judgment against the punitive damages claims, it should be denied.

## RECOMMENDATION

For the reasons set forth above, Wal-Mart's Motion for Summary Judgment (docket #34)
should be GRANTED IN PART as to those portions of the First and Second Claims alleging
hostile work environment and retaliation and DENIED IN PART as to those portions of the First
and Second Claims alleging discrimination based on disparate treatment.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due March 12, 2009.  If no
objections are filed, then the Findings and Recommendation will be referred to a district judge
and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy
of the objections.  When the response is due or filed, whichever date is earlier, the Findings and
Recommendation will be referred to a district judge and go under advisement.

DATED this 23rd day of February, 2009.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

32 - FINDINGS AND RECOMMENDATION